**UNITED STATES**

v.

**Otis S. BATZEL, 063 56 2983, Lithographer Third Class (E–4), U.S. Naval Reserve.**

**NMCM 82 1211.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 29 Oct. 1981.

Decided 28 Dec. 1982.

LT Daniel Lippman, JAGC, USNR, Appellate Defense Counsel.

Michael F. Fasanaro, Jr., Individual Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

Before SANDERS, Senior Judge, and BOHLEN and MICHAEL, JJ.

SANDERS, Senior Judge:

At a trial by general court-martial with members appellant was found guilty, contrary to his pleas, of an assault and battery upon Seaman Apprentice (SA) Cowden and of an assault upon SA Cowden with intent to inflict grievous bodily harm, Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928; of an indecent assault upon SA Cowden, Article 134, UCMJ, 10 U.S.C. § 934; and of housebreaking, Article 130, UCMJ, 10 U.S.C. § 930. His sentence to confinement at hard labor for three years, reduction to pay grade E–1, total forfeitures, and a bad-conduct discharge was approved by the convening authority.

We find no merit in appellant's three assignments of error.

I

THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY DENYING HIS MOTIONS TO SUPPRESS THE SHOW–UP IDENTIFICATION AS WELL AS APPELLANT'S PRETRIAL CONFESSIONS.

On the night of 3 May 1981 SA Cowden had gone to bed in her barracks room at the Naval Station, Norfolk, Virginia. She was alone since her roommate had the duty in another building. About 0035, 4 May, SA Cowden was awakened by a man lying on top of her and kissing her. She immediately told him to get up and get out but he only sat on the edge of the bed. A conversation of several minutes duration ensued during which SA Cowden repeatedly tried to get her accoster to leave but to no avail.

During the conversation he identified himself as ET2 George Johnson of the USS NIMITZ and at one point leaned over as if he were doing something with his shoes. Ultimately she asked him to get her robe for her, which he did from the back of a chair. She put it on under the covers and shortly afterwards he put on his jacket. He then struck her sharply in the nose and began to walk rapidly toward the bedroom door. SA Cowden got from her bed and with the assailant's back to her she grabbed him around the waist, whereupon he turned and struck her in the face seven or eight times and ran from the room. From her door SA Cowden saw him leave the building by a fire exit.

During this confrontation SA Cowden's room was illuminated by the glow from a digital clock about 10 feet from her bed and by a nearby bed lamp devised from an approximately 60 watt light bulb which had been spray painted black. The hall was brightly lit.

SA Cowden immediately reported the attack upon her to those on duty in the building who, in turn, called the base police. Officer Pollard arrived within a very few moments and was told by SA Cowden that her assailant was a white male, approximately 5'7" or 5'8" tall, approximately 165 lbs, with short brown hair, wearing a light tan jacket, a light blue or gray knit shirt and gray corduroy trousers. She added that he had fled from the left side of the building and that he had identified himself as ET2 George Johnson of the NIMITZ. This description was relayed by radio to other police together with the information that the assailant would probably be headed west toward the NIMITZ.

About 0100 Officer Jernigan was patrolling in the waterfront area of the base when he heard the "be on the lookout". Almost immediately he saw an individual about four blocks from SA Cowden's barracks running in a north westerly direction in a darkened area of the base. As Officer Jernigan followed him, the person was seen to scale a six-foot fence and drop behind it as if to hide. Officer Jernigan stopped his

vehicle, ordered the individual, who turned out to be appellant, to climb back over the fence (which he did with ease) and noticed that he answered the physical description of SA Cowden's assailant. Although an examination of appellant's identification card revealed that his name was not Johnson, when Officer Pollard was told of the apprehension he directed that appellant be brought to SA Cowden's barracks for identification. It was Officer Pollard's opinion that this should be done as soon as possible since SA Cowden's left eye was completely closed with blood running from it. Her right eye was swelling shut and it was apparent that in a short while she would be unable to see.

Within a very few minutes SA Cowden confronted a handcuffed appellant and identified him as her assailant. Although she could not recognize his facial features she noticed the similarity in hair and beard as well as the similar jacket, shirt, pants, height and weight. SA Cowden also noticed that appellant's shoe laces were untied and that his pants legs were rolled up one turn as had been her assailant's. She asked that the suspect be turned around since she had observed as he left her room that her assailant's trousers had a small red "Levi" tag on the back. Appellant's pants had the same type tag.

When appellant was first apprehended, Officer Jernigan informed him that he was suspected of assault and, while frisking him, told him of his rights under Article 31, UCMJ, 10 U.S.C. § 831. The same advice was again given, this time by Officer Pollard, following SA Cowden's identification.

After an examination of the scene of the crimes, Officer Pollard returned to the base police headquarters to prepare his report. There he found appellant in the lunch room. What followed can best be described in Officer Pollard's own words:

I was sitting at a table which is approximately one row away from the accused and he—probably approximately ten minutes had passed by, the accused stood up and he asked me, he said, "How long is this going to take?" And I said,

"I have no idea." I said, "Detective Huguenel is responding." I said, "I don't know." I once again returned to my report. Two or three minutes passed and he asked me again, he said, "Look," he says, "I'd like to get this over with." And I said, "Well there's nothing I can do for you. You must wait for Detective Huguenel." And he immediately stood up and he said, "Look," he says, "I really want to get this over with." And he started telling me about what had taken place and I put my hand up and I stopped him and I said, "I've got to remind you that you have been advised of your rights. Anything you say, can and will be used against you." And he started telling me that, he said, "Okay, I did it." He says, "I had left the club." referring to the Windjammer, "I had a few beers," and I stopped him again. And I said, "Why don't you just sit down and wait for the duty investigator?" Well he didn't stop his conversation so I walked about 20 feet and yelled for Sergeant Tocolison who was the desk lieutenant. I returned back and he continued on that he had came by the barracks and the gate was open, that he went in through the ladies' head which is on the south side of the building. He immediately walked out and up the first stairway to the hallway upstairs and immediately went to her room. He said the door was unlocked, he went inside, he seen the girl, referring to Cowden laying in a bed and he walked over, sat down and kissed her. He stated that she woke up and they had a conversation and she got upset and he hit her and he ran out.

(R. 35–36).

Appellant was formally interrogated by Detective Huguenel of the base police at about 0300, 4 May 1981. Utilizing the typical police form, appellant was informed orally and in writing that he was suspected of breaking and entering, attempted rape and assault. He was then advised of his rights to counsel and, for the third time that evening, of his rights under Article 31, UCMJ. By his signature appellant acknowledged that he understood his rights and did not desire to avail himself of them. He then made an oral statement substantially similar to the one he had made to Officer Pollard.

If, as he did in this case, an accused makes a timely motion to suppress, an identification of him as the perpetrator of an offense is inadmissible if the identification is the result of an unlawful identification process, that is, if the process is conducted by the police in an unnecessarily suggestive manner or otherwise in violation of the due process clause of the Fifth Amendment of the Constitution of the United States as applied to service personnel. Mil.R.Evid. 321.

The initial question, therefore, is whether SA Cowden's confrontation with appellant was unnecessarily suggestive. Even if we assume that a show-up involving a single handcuffed individual in the custody of police officers is always suggestive, it does not always follow that the show-up was unnecessary ·under the. circumstances. Thus, where a witness who had been stabbed numerous times was confronted in her hospital room two days after the assault by a Negro (the only one in the room) handcuffed to an officer, her identification of the suspect was admissible. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The Court found that the police had followed the only feasible procedure. An immediate confrontation was imperative due to the witness' critical condition and had the suspect not been her assailant, the witness could have exonerated him. Looking to the totality of the circumstances, the Court held that the show-up was not so unnecessarily suggestive or conducive to irreparable mistaken identification that the suspect was denied due process of law. *Id.* Similar speedy one-on-one confrontations have been approved because they promote fairness by assuring reliability and, should the suspect not be the offender, permit immediate further investigation in the area. *United States v. Cyrus,* 41 C.M.R. 959 (A.C.M.R. 1970); *United States v. Smith,* 2 M.J. 562 (A.C.M.R.1976).

■ In the instant case the show-up within minutes of the offenses was not only dictated by sound police practice, it was rendered absolutely necessary under the circumstances if valuable time was not to be lost. SA Cowden was severely injured and, although unknown to the police at the time, would be transferred to a hospital approximately 200 miles away in less than 24 hours. One of her eyes was completely closed when the police arrived at her barracks and the other was rapidly closing. If an identification, or exoneration, was to be made in the foreseeable future, it had to be made then and there. We commend rather than fault the speedy action of the police.

■ The timely procedure utilized by the police was not only necessary but it resulted in a reliable identification, the factor which has been described as the linch pin in determining the admissibility of an identification. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Applying the tests set forth in *Manson* we find:

1. SA Cowden had ample opportunity to view the suspect at the time of the crime. She talked with him for several minutes while he sat on the edge of her bed in a room which, if not well lit, was amply lit for this purpose. Subsequently she saw him in the brightly lit hall as he fled the building.

2. The circumstances of the confrontation in her bedroom were such that it may be said that SA Cowden's attention was fairly riveted on appellant.

3. Her description of him was detailed and, as proved by the events, accurate.

4. SA Cowden identified appellant with certainty. Influenced by such factors as his slight beard, his rolled-up pants, the color and type of his clothes, his untied shoelaces, his height and weight, and the distinctive red tag attached to the seat of his trousers, she expressed no doubt that the suspect was her attacker. We note that the accuracy of this identification was corroborated by the evidence that the fresh blood found on appellant's jacket could not have been his, could have been SA Cowden's, and that its splattered pattern was consistent with the type of wounds she had received.

5. Substantially less than an hour transpired between the commission of the offenses and the identification.

■ The identification procedure followed in this case, therefore, was lawful and the statements subsequently made by appellant were not rendered inadmissible thereby. Likewise the record amply establishes that appellant's initial statement to Officer Pollard was spontaneous and hence admissible even if adequate warning had not previously been given. *United States v. Miller*, 7 M.J. 90 (C.M.A.1979). Appellant's statement to Detective Huguenel was admissible since it was preceded by compliance with both Article 31(b), UCMJ, and *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

## II

THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT THE APPELLANT OF SPECIFICATION 2 OF CHARGE I.

■ Specification 2 under Charge I alleges that appellant committed "an assault upon SA Cowden by striking her repeatedly in the face with his hands and did thereby intentionally inflict grievous bodily harm upon her, to wit: a retinal detachment and choroidal rupture in the membrane of the perimacular area of the left eye with a resulting loss of vision in the left eye."

Appellant contends that his striking SA Cowden was simply a spontaneous reaction to her grabbing him around the waist from behind and that he had no intent to harm her. He further maintains that his consumption of alcohol coupled with his hypoglycemia rendered it impossible for him to form the necessary intent.

In our opinion, the circumstances surrounding the offense refute both positions.

Earlier in the evening appellant had gone to a petty officers' club where he consumed alcoholic beverages until the club closed. When a young woman refused to visit other bars with him, he became angry and started

walking back toward his ship alone. As he passed SA Cowden's barracks which he knew to house women, he decided to go in and find "any girl". Entering the building via a hole in the fence and a window, appellant went to the second floor and SA Cowden's room where the events heretofore described took place.

When apprehended appellant had the faint odor of alcohol on his breath but did not appear intoxicated. His speech was clear and coherent and he was cooperative with the officers. His coordination was unimpaired as evidenced by his rapid flight from the barracks and his twice without difficulty climbing a six-foot fence shortly thereafter.

Turning to appellant's contention that he lacked the ability to form the necessary specific intent because of drink and hypoglycemia, we note that there was conflicting testimony concerning whether his glucose tolerance was normal or abnormal. We find it unnecessary, however, to discuss this variance because there is simply no credible evidence that on the night in question appellant's reason was so beclouded that he did not know exactly what he was about. All his physical actions from his leaving the club to his apprehension reflect one whose mind was as nimble as his footsteps.

Similarly, we are convinced that appellant was not merely trying to escape SA Cowden's grasp when he so brutally beat her about the face. The ferocity of the attack was totally unnecessary if he were simply attempting to break away, and the tragic results were the foreseeable consequences of his act. That appellant intended these natural and probable consequences is the inescapable inference to be drawn from his conduct. Paragraph 207c(2), *Manual for Courts-Martial, 1969 (Rev.).*

### III

**THE SENTENCE GIVEN APPELLANT IS INAPPROPRIATELY SEVERE.**

We reject this assignment of error out of hand. The sanctity of her bedroom and person having been violated by appellant, SA Cowden tactfully attempted to get him to leave. His response was a blow to the nose. With commendable pluck she then attempted to apprehend him only to be viciously set upon, the aftermath of which she will bear to her grave. The sentence awarded was entirely appropriate for both appellant and the crimes he committed.

Accordingly, the findings of guilty and the sentence as approved on review below are affirmed.

Judge BOHLEN and Judge MICHAEL concur.