UNITED STATES

v.

Senior Airman Edward WHITE, FR 437–66–2008, United States Air Force.

ACM 24046.

U.S. Air Force Court of Military Review.

Sentence Adjudged 1 April 1983.

Decided 24 Feb. 1984.

Appellate Counsel for the Accused: Colonel George R. Stevens, Colonel Leo L. Sergi and Major Richard A. Morgan.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Brenda J. Hollis.

Before KASTL, CANELLOS and RAICHLE, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Evidentiary questions are before us concerning residual hearsay and eyewitness testimony after an unnecessarily suggestive identification process. We reverse as to the residual hearsay and find the identification process permissible in this case.

1. The offenses were charged as violations of Article 132, U.C.M.J., 10 U.S.C. § 932. Despite

## I

We consider first the matter of residual hearsay under Mil.R.Evid. 804(b)(5). The salient facts are these: Senior Airman Edward White was charged with making a household goods claim which was false in the amount of $3,665.00; the sum was claimed for loss of sterling silverware during his transfer from Aviano Air Base, Italy, to K.I. Sawyer Air Force Base, Michigan. He was also charged with employing a letter with a forged signature to support that claim.[1]

The accused transferred in late summer 1979. On 17 April 1981, he submitted his damage claim. When asked to substantiate ownership of the silverware, he submitted a statement dated 27 April 1981 purportedly signed by his mother, Mrs. Peola White; it certified that she had given him the sterling silverware as a gift when he married in 1971.

The accused was questioned by Air Force Office of Special Investigations (OSI) agents regarding his claim; he denied authoring the challenged statement and explained that he had received it from his mother after so requesting.

Peola White, 68, was questioned by the OSI on 9 December 1981. She denied any knowledge of the statement, insisting that she had neither signed it nor ever given her son a silverware set. The oral interview. was conducted by Special Agent B and witnessed by Special Agent L at Mrs. White's home in Vidalia, Louisiana. Nine months later, in September 1982, OSI agents approached Mrs. White with a statement they had prepared based upon her earlier comments and B's notes; Mrs. White signed the statement but refused to swear to it because she was a Christian and her word was sufficient. The OSI agents were accompanied by the Vidalia Chief of Police.

Mrs. White did not testify at the court-martial, mainly because she was found to be

pleas of not guilty, the accused was convicted

too ill to travel.[2] Her written statement was admitted by the court, over strenuous defense objection, as residual hearsay under Mil.R.Evid. 804(b)(5).

The military judge made special findings concerning his admission of Mrs. White's statement under the residual hearsay exception. He concluded that because of the present poor health of Mrs. White and her physical, emotional, and mental inability to testify, she was unavailable as a witness under Mil.R.Evid. 804(a)(5).[3] Based upon the testimony of OSI agent L, he also found factually that Mrs. White was an elderly woman who, at the time of the OSI interview, appeared healthy and alert, exhibiting no signs of significant mental or physical impairment. The judge further found that she had no difficulty understanding the OSI agent's questions or responding to them. Accordingly, he held Mrs. White's statement of September 1982 admissible.[4]

Considerable evidence supported the accused's ultimate conviction besides the statement of Mrs. White. Among the more salient matters were these: (a) an enlisted co-worker testified that he was a friend of the accused; he indicated his impression

by a general court-martial consisting of a military judge sitting alone.

2. Earlier, the prosecution had given the defense written notice of its intent to introduce Mrs. White's statement under Mil.R.Evid. 804(b)(5).

3. The trial counsel made an affidavit to support his position, explaining to the military judge that Mrs. White was unable to travel to attend the trial. The relevant portions of that document follow:

> Peola White is 68 years old and in very poor health. In 1981, she had a double mastectomy. After the surgery, however, she continued to live alone in Vidalia, LA. In the past several months, however, her condition deteriorated rapidly. She has inexplicably lost a great deal of weight and her mental facilities [sic] have become greatly impaired. Mr. [Charles] White would receive calls from friends in Vidalia to the effect that his mother had taken to wandering out of her house without reason and friends would drive by, see her, and take her home. The situation became such that Mr. White felt compelled recently to bring his mother to New Orleans to live with him, where she is under a physician's care. A brother of Mr. White quit his job in order to stay with their mother, who requires constant supervision to avoid her wandering out of the house. Mr. White recounted a recent incident where he had to search for his mother on the street after such an episode.
>
> Mr. White is of the opinion his mother is in no condition to respond to a subpoena, or to even understand it. He states that Mrs. White has always refused to fly, even when she was healthy. He believes it would be impossible for her to take a bus by herself, in that she would be incapable of finding the right bus when it came time to change. The only way possible would be for her to have someone she is very close to and trusts to be her companion. Mr. White stated that no such person would be able to make the trip

> with her due to jobs, expenses, etc. Even if she were to take the bus with a companion, in Mr. White's opinion, a trip to Michigan would seriously jeopardize her already fragile health.
>
> In any event, Mr. White stated his mother would not be able to intelligently communicate any testimony were she to travel to Michigan due to her present mental condition.

4. After reviewing the evidence and proffer of proof from the prosecution, the military judge admitted Mrs. White's written statement as residual hearsay. He specifically noted that:

> 12. Based on the amount and nature of the circumstantial evidence available to the prosecution to independently corroborate the truth of the matter asserted by Mrs. White, plus other indicia of reliability present in the circumstances of Mrs. White's statement, to include the fact that she is the accused's mother and that a copy of Prosecution Exhibit 9 [her purported signature on the statement concerning the silverware] was actually shown to her during the interview, I find that the confrontation clause of the Sixth Amendment would not be violated by the admission of Mrs. White's statement.
>
> 13. Also based upon the totality of the circumstances, the above circumstantial evidence and indicia of reliability, in addition to Mrs. White's statement being of a nature very close to a statement of personal or family history expressly admissible under MRE 804b(4), I find that Mrs. White's statement has circumstantial guarantees of trustworthiness equivalent to those of other exceptions to the hearsay rule contained in M.R.E. 804b and that the general purpose of these rules and the interest of justice will be best served by the admission of Mrs. White's statement in evidence under M.R.E. 804b(5). In making this determination, I have considered proposed findings of fact submitted by the defense counsel. . . .

that the accused never lost a sterling silverware set; (b) another acquaintance testified that he knew of the potential claim and opined that the accused stated "very bluntly" that no silverware ever existed; (c) an Army documents examiner concluded that it was "more likely than unlikely" that the accused had executed the "Peola White" signature on the questioned document—however, the examiner stated that his confidence was not sufficient to base a decision upon that opinion in such matters as buying a house or car; (d) no silverware was specifically listed on the accused's household goods inventory at the time of his move from Italy; (e) the accused's statement that he had not prepared the paper for his mother's signature appears contradicted by scientific evidence that he possessed identical paper; and (f) the accused did not report the missing silverware until some 20 months after delivery of his household goods to Michigan.

On the other hand, significant defense evidence challenged the prosecution's theory of the case. Three of Mrs. White's family members—two sons and a sister-in-law—testified at trial; their testimony enforced the defense thesis that Mrs. White was less than fully competent mentally, either when speaking with OSI agents in December 1981 or when signing the statement confirming her earlier oral comments in September 1982. The family members characterized her after surgery in spring 1981 as "fearful," "hallucinating," "irrational," "easily influenced," and "subservient toward people in authority." As her son, Mr. Johnnie White, testified:

Q: What type of fears did she have? Fearful of what?

A: People, she was fearful of ownership, knowing that she owned anything. She was especially fearful of policemen, I suppose anybody in a uniform.

Q: Why was she fearful of ownership? What do you mean by fearful of ownership?

A: If she had something, she wouldn't admit that she owned it. Say, she wouldn't put money in the bank.

\* \* \* \* \* \*

Q: Your mother's personality. How would you describe it?

A: I'd say that my mother's an easy-going person, a person who is easily influenced. She probably would do whatever somebody came up and told her to do, especially if she thought it was somebody who was in authority.

Both Mr. Johnnie White and Mr. Charles White testified that they had seen the silverware in their family home while growing up and that Mrs. White had given it to the accused as a wedding gift. The accused's sister-in-law, Mrs. Madeline White, a school teacher, also testified; she claimed that she had signed the "Peola White" signature, largely because Mrs. White was ill, and had returned the letter to the accused without informing him that this had been done. Finally, Mr. Charles White, an attorney claiming nine years of Government experience, testified he currently serves as a counsel for the City of New Orleans and attorney for both the New Orleans Aviation Board and Dillard University. He related that he and his wife had vacationed in Europe in 1976; he swore to seeing the silverware in the accused's possession when they visited him at Aviano during his tour there.

II

■ We specifically hold that the hearsay evidence offered here—the statement of Mrs. Peola White—fails to satisfy the residual hearsay exception of Mil.R.Evid. 804(b)(5). Accordingly, we find that the trial court abused its discretion and reverse.[5]

5. Preliminary questions concerning admissibility of hearsay are within the sound discretion of the trial court. Mil.R.Evid. 104(a). The trial court has considerable discretion in this area.

*Huff v. White Motor Corp.,* 609 F.2d 286, 291 (7th Cir.1979); *see also United States v. Anderson,* 618 F.2d 487, 491 (8th Cir.1980). However, that discretion is not unfettered—its exer-

Our analysis begins with Congressional intent, Federal interpretations of the residual hearsay rule, and developing military caselaw.

Congressional history makes it clear that the residual hearsay rule has a "narrow focus" and a "limited scope." *United States v. Bailey*, 581 F.2d 341, 346–347 (3d Cir.1978). Various courts have characterized the rule as one to be employed only in "truly exceptional circumstances;"[6] it is to be "invoked sparingly"[7] in "rare and even strange factual situations."[8] With this standard in mind, we examine cases which have been resolved in favor of admission *vis-a-vis* those not admitting the statements.

If the proffered hearsay is material, trustworthy, and probative, Federal courts have accepted it. A quick survey of representative fact situations supports this proposition. Thus, for example, in *United States v. Blakey*, 607 F.2d 779 (7th Cir. 1979), an extortion victim's tape-recorded conversations made no more than 23 minutes after the incident were held properly admitted. Other witnesses were available for cross-examination; corroboration existed. In *Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953 (3rd Cir. 1978), a crucial memorandum of H, deceased executive of plaintiff, prepared by plaintiff's attorney and adopted by H was admitted; there was no reason to doubt its trustworthiness. In *United States v. Lyon*, 567 F.2d 777 (8th Cir.1977), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1977), the transcribed interview of defendant's landlady to the FBI was held admissible; the event occurred 10 years earlier and the landlady, with a poor memory, now had no independent recollection; other evidence was lacking, and a shoe box (which the woman gave to the FBI agent at the time

of her original statement) had been initialled by both parties; it conformed to the original description contained in the statement.

In *United States v. Medico*, 557 F.2d 309 (2d Cir.1977), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977), a youth saw the license plate of a getaway car after a bank robbery and told that data to a bank customer, X. X then told a bank employee at the robbery scene. The license number matched that of the accused. Neither X nor the youth were available for cross-examination at trial, despite prosecution attempts to locate them. The evidence was held admissible, despite its double hearsay nature; the data was reliable, the timeframe was brief, and there was only a small likelihood of inaccuracy. In *United States v. Ward*, 552 F.2d 1080 (5th Cir.1977), *cert. denied*, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977), an FBI agent's testimony containing a hearsay statement from a truckdriver that his truck had been stolen was admitted; the driver was now unavailable. Defendants had argued that such a statement was inherently unreliable and self-serving since the driver had to explain the disappearance of the truck in a manner not implicating him.

Contrariwise, statements having insufficient indications of reliability and trustworthiness have been held inadmissible. A representative case is *United States v. Bailey*, *supra*. There, in an armed robbery, the trial court abused its discretion in admitting a statement made during declarant's negotiations with the FBI for reduction of charges against him; that statement was not under oath and corroborating evidence lacked a sufficient degree of reliability. The case contains an excellent summation of authorities and analysis of Congressional intent. In *United States v. Love*, 592 F.2d

---

cise can be overturned on appeal for abuse. *United States v. Friedman*, 593 F.2d 109, 118 (9th Cir.1979); *United States v. Bailey*, 581 F.2d 341, 346 (3rd Cir.1978). *See generally* Holmes, *The Residual Hearsay Exceptions: A Primer for Military Use*, 94 Mil.L.Rev. 15, 36 (Fall 1981).

6. *United States v. Thevis*, 665 F.2d 616, 629 (5th Cir.1982).

7. *Robinson v. Shapiro*, 646 F.2d 734, 742 (2nd Cir.1981).

8. *United States v. Turner*, 475 F.Supp. 194, 200 (E.D.Mich.1978).

1022 (8th Cir.1979), a statement made by a wayward juvenile to an FBI agent under the Mann Act was held insufficient to bring it under the residual hearsay exception; circumstantial guarantees of trustworthiness were not present and the court particularly feared the declarant could have made the statement to curry favor with authorities. Finally in *United States v. Fredericks,* 599 F.2d 262 (8th Cir.1979), an assault with a dangerous weapon case, the statement was found not admissible since not under oath. The court discerned a possible motive for the declarant to lie—she had ties to the defendant.

Since at least 18 states have also adopted the Federal Rules of Evidence in whole or part, state evidentiary decisions are entitled to consideration as well.[9] Two cases are particularly instructive. In *State v. Jones,* 123 Ariz. 373, 599 P.2d 826 (Ariz.App.1979), a rape victim became incompetent before trial; an investigating detective was permitted to relate, over objection, what the victim had said about the accused's appearance. Finding such evidence inadmissible, an Arizona appellate court noted that the statement did not have equivalent guaran-

tees of trustworthiness as to be properly admissible. Similarly, in *Maynard v. Commonwealth,* 558 S.W.2d 628 (Ky.App.1977), an FBI agent was permitted at trial to testify as to the hearsay testimony of an informant; the FBI agent further opined that the witness was reliable. The decision was reversed on appeal, the appellate court judicially adopting Rule 804(b).[10]

The first military case addressing residual hearsay was *United States v. Ruffin,* 12 M.J. 952 (A.F.C.M.R.1982), *pet. denied,* 13 M.J. 494.[11] There, we held that the accused's stepdaughter's out-of-court statement was admissible; it did not violate the accused's confrontation rights since there were circumstantial guarantees of trustworthiness to support the truth of the statement.

A trilogy of Army cases followed. *United States v. Whalen,* 15 M.J. 872 (A.C.M.R. 1983), involved admission under the residual hearsay exception of an individual's pretrial sworn statement; the Army court reasoned that the statement was sufficiently trustworthy to permit its admission. In *United States v. King,* 16 M.J. 990 (A.C.M.R.1983), statements of the accused's wife-to-be, 15

---

**9.** *See* Holmes, *supra* note 5, at 19.

**10.** A closely related area is whether grand jury testimony may be admitted against an accused when the witness is unavailable at trial. Those cases perhaps bear on the instant one: If such testimony is *inadmissible* it might follow that testimony in the present case—not surrounded with a grand jury's guarantees of reliability—would similarly be unacceptable. Unfortunately for this thesis, the Federal courts are not in accord as to whether such testimony may be considered. Testimony of such a nature was held admissible in *United States v. Carlson,* 547 F.2d 1346 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *United States v. West,* 574 F.2d 1131 (4th Cir.1978) and *United States v. Garner,* 574 F.2d 1141 (4th Cir.1978), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). The U.S. Supreme Court denied certiorari in *Garner.* Justice Stewart, with whom Justice Marshall joined, dissented from the denial, expressing "grave doubts" regarding admissibility of the grand jury testimony.

In contrast, grand jury testimony was not permitted in *United States v. Gonzalez,* 559 F.2d 1271 (5th Cir.1977); *United States v. Hen-*

*ry,* 448 F.Supp. 819 (D.C.N.J.1978); and *United States v. Fiore,* 443 F.2d 112 (2nd Cir.1971) (pre-Federal Rules of Evidence case). *See generally* Annot., 50 A.L.R.Fed. 848 (1980) and S. Saltzburg and K. Redden, Federal Rules of Evidence Manual 670 (1982).

In a similar vein, the Army Court of Military Review recently decided *United States v. Thornton,* 16 M.J. 1011 (A.C.M.R.1983). There, the accused was convicted of aggravated assault. The court held that the victim's sworn statement given in an Article 32 hearing was improperly admitted under the residual hearsay exception; the court was unconvinced that defense counsel had sufficient requisite motive to develop the testimony of the declarant at this hearing as he would have had on cross-examination at trial. Finding this error harmless beyond a reasonable doubt, however, the court affirmed the accused's conviction.

**11.** Mil.R.Evid. 804 is taken from the Federal Rule without change. *See* Saltzburg, Schinasi and Schlueter, Military Rules of Evidence Manual 380 (1981); Crowe, *M.R.E. 804(b)(5): The Residual Hearsay Exception,* A.F.J.A.G. Rptr. Vol. II, No. 5, p. 129 (October 1982). *See* the excellent history developed in *United States v. Thornton, supra,* at 1014.

years old, were held not sufficiently trustworthy for admission; the statements were found to lack the guarantees of trustworthiness necessary for admissibility. The case was decided under Mil.R.Evid. 803(24), a parallel section to Mil.R.Evid. 804(b)(5). In *United States v. Thornton,* 16 M.J. 1011 (A.C.M.R.1983), the Army court found a sworn statement improperly admitted under the residual hearsay exception; the court was not convinced that defense counsel had the requisite motive to develop the declarant's testimony at the hearing as he would have had on cross-examination at trial; moreover, the statement was not marked with such trustworthiness that it should be held admissible.

Finally, this Court held in *United States v. Crayton,* 17 M.J. 932 (A.F.C.M.R.1984) that the earlier statements of a child witness who later recanted her testimony were inadmissible since they lacked substantial guarantees of reliability.

### III

▮ We now apply the law developed in II to the facts at hand. We have already noted that the statement of Mrs. Peola White was improperly admitted under Mil.R.Evid. 804(b)(5); more specifically, we find that *her statement fails to present the equivalent circumstantial guarantees of trustworthiness in the absence of cross-examination required by the Military Rules of Evidence.* Numerous factors persuade us that the statement is untrustworthy.[12]

There is no way to accurately assess the trustworthiness of Mrs. White's declaration to the OSI. Everyone appears to concede her inability to give meaningful testimony today. As for the timeframe in which she made the statement, only the OSI agent who witnessed the interview claims she was reliable; on the other side, three family members describe her as fearful, hallucinating, protective of her property, and ready to say whatever she thought the authorities wanted. The point is, *we cannot tell whether Mrs. White was reliable when she spoke with the OSI.* Such a crap shoot will not do when individual liberty is in the balance.[13]

There is little specific corroboration of Mrs. White's statement.[14] Moreover, the silverware was given as a present, if at all, around the time of the accused's marriage in 1971; thus, the hearsay is even more dubious because Mrs. White was being asked to exercise her memory as to something occurring almost a decade before.[15] Furthermore, Mrs. White did not take an oath. Although she apparently felt a Christian need not swear, the presence of an oath may carry some weight in assessing trustworthiness.[16]

Other factors militate against admission of this statement as residual hearsay. The statement was given to the OSI. We do not question the integrity or observation

---

**12.** In his useful article in the Military Law Review, Captain Holmes lists various factors considered by the Federal courts to assess circumstantial guarantees of trustworthiness. They are: oaths; declarant's motivation; corroboration; fact versus conjecture; verification by the declarant; personal knowledge of the declarant; proximity in time; reputation of the declarant; and cross-examination of the declarant. Holmes, *supra* note 5, at 48–63.

**13.** Mil.R.Evid. 803(8)(B) excludes matters observed by law enforcement personnel. *See generally Furtado v. Bishop,* 604 F.2d 80, 91 (1st Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

**14.** At least one Federal circuit has held that corroboration of the hearsay statement is irrelevant to its trustworthiness. *Huff v. White Motor Corp., supra,* at 293. Other courts have

disagreed. *See United States v. West, supra,* at 1135; *United States v. Hinkson,* 632 F.2d 382, 386 (4th Cir.1980). *See also United States v. Bailey, supra,* at 349.

**15.** *See United States v. Leslie,* 542 F.2d 285, 290 (5th Cir.1976) (statements made a few hours after an event); *Turbyfill v. International Harvester Co.,* 486 F.Supp. 232, 234 (E.D.Mich. 1980) (the afternoon following an event); *State v. Maestas,* 92 N.M. 135, 584 P.2d 182, 189 (N.M.Ct.App.1978) (within 24 hours of the event).

**16.** *See United States v. Carlson, supra,* at 1356. *See also Furtado v. Bishop, supra,* at 91; *United States v. Fredericks,* 599 F.2d 262, 265 (8th Cir.1979).

powers of the testifying agent; yet we are loath to say a hearsay statement gains reliability simply because an investigator might give his conclusion that the declarant is clear-headed and reliable.[17] Indeed, in this particular case, the investigating authority who testified was the only witness asserting that Mrs. White was competent at the time of making her statement. Furthermore, the presence of a local chief of police as go-between detracts from reliability, given the facts of this case.

We are mindful of the question of credibility of the three witnesses from the accused's family who testified as to the family silverware. Yet to convict on the basis of Mrs. White's statement, one must say—as did the author of the staff judge advocate review—"I simply do not believe the testimony of the accused's two brothers and his sister-in-law."

Various commentators have suggested different considerations for deciding whether to exclude a proffered statement. Such analysis also lends support to our conclusion that the statement of Mrs. White is inadmissible.[18]

In sum, we believe this a situation where the interests of justice are ill-served by welcoming Mrs. White's statement within the narrow category of residual hearsay. There is no way, absent the crucible of confrontation and cross-examination, to

measure how lucid and truthful Mrs. White was when the statement was made, whether her powers of observation were accurate, and whether her memory served her without failing in this situation. The main justification for excluding hearsay is the absence of full, effective cross-examination of the declarant so as to answer questions, solve difficulties, reconcile contradictions, explain obscurities, and remove ambiguities. Measured by that standard, the hearsay in this case is clearly unacceptable. *United States v. Thornton, supra,* at 1014 n. 2. The proof was in delicate balance and the testimony of Mrs. White was crucial, in our view. Accordingly, we cannot say this was harmless error.

## IV

The United States Supreme Court has suggested that the hearsay rule and the Sixth Amendment right to confrontation "stem from the same roots," but are not congruent. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489, 495 (1970). Thus, while it has been suggested that the twin concepts of residual hearsay exceptions and the confrontation clause have merged, this is far from clear.[19] *See generally Ohio v. Roberts,* 448 U.S. 56, 73, 100 S.Ct. 2531, 2542, 65 L.Ed.2d 597, 61, (1980).[20] Since the evidence has been deter-

---

**17.** Mil.R.Evid. 803(8)(B); *see United States v. Thornton, supra,* at 1014 (statement procured and prepared by law enforcement official) and *Maynard v. Commonwealth,* 558 S.W.2d 628 (Ky.App.1977) (FBI agent's representations of witness reliability).

**18.** The four traditional considerations usually invoked to exclude hearsay testimony are: How truthful was the original declarant? To what extent were his or her powers of observation adequate? Was the declaration truthful? Was the original declarant able to adequately communicate the statement? Measuring evidence against this framework should assist in determining the reliability of the evidence. *See* Drafter's Analysis in Saltzburg, Schinasi and Schleuter, Military Rules of Evidence Manual 371 (1981).

Wigmore suggests that developing Anglo-American law only recently has looked at the various exceptions to the hearsay rule to pro-

pose a unified theory. Generally, three different classes of reasons undergird the exceptions: (a) the circumstances are such that a sincere, accurate statement would naturally be uttered and no plan of falsification formed; (b) there is such a danger of easy detection or fear of punishment that the truth will come out; and (c) the statement is made under such conditions of publicity that an error—if it had occurred—would probably have been detected and corrected. Wigmore, Evidence 254 (Chadbourn rev. 1974). *See also* 4 Weinstein and Burger, Weinstein's Evidence 804(b)(5)[01] (1981).

**19.** *See United States v. West, supra,* at 1138. *See also United States v. Thevis,* 84 F.R.D. 57, 69 (N.D.Ga.1979).

**20.** In *Dutton v. Evans,* 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213, 226 (1970), the Supreme Court also suggested that should the hearsay statement be "crucial" or "devastat-

mined to be inadmissible on the basis of the residual hearsay issue, there appears to be no need to address the confrontation clause of the Sixth Amendment. *Contra United States v. Thornton, supra,* at 1015.

### V

The accused was also found guilty of two larcenies at Scott Air Force Base, Illinois, in violation of Article 121, U.C.M.J., 10 U.S.C. § 921. We turn now to the defense contention that the military judge erred as to these offenses by admitting the testimony of Technical Sergeant A regarding identification of the accused. The defense argues that such identification was the result of an illegal pretrial showup and lineup.[21] We disagree and find the evidence admissible under Mil.R.Evid. 321(d)(2).

The facts of the case are significant to our decision; we will set them forth in some detail.[22]

On 30 March 1982, Technical Sergeant A encountered a man in the hallway of the gym at Scott Air Force Base, Illinois. The encounter involved an exchange of greetings as TSgt A stepped aside to let the man pass. The encounter lasted approximately four seconds; the hallway was well lit. During the encounter, TSgt A looked into the man's face and noticed that he was a tall, heavy-set black man, wearing a brownish colored coat of corduroy or velour material, blue jeans, and dark-rimmed glasses. He also noticed the man was carrying a gym bag that looked like A's own bag.

After the encounter, TSgt A went to his locker and discovered his gym bag missing. He immediately left the locker room and went back into the hall. Hearing the sound of running footsteps and the sound of the outside door to the gym opening, TSgt A ran out searching for the man he had encountered. Outside the gym, A saw the man running through the parking lot, still carrying what appeared to be the same gym bag. TSgt A gave chase across the gym parking lot to the NCO Club, where the man dropped the bag. TSgt A stopped to examine the bag. At that time, the man disappeared around a corner of the NCO Club, running in the direction of the bowling alley, and A was unable to locate him again.

During the chase, it was dark outside but the parking lots of the gym and the NCO Club were lighted. Twice during the chase, the man turned his head and looked back toward A. Shortly after he gave up the chase, A met a security policeman and gave him a description of the man. A's substantial description was radioed to Security Police patrols.

Shortly thereafter, Security Police apprehended the accused nearby the bowling alley. The accused is a tall, heavy-set black male. At the time of his apprehension, he was wearing blue jeans, a brownish colored corduroy coat, and dark-rimmed glasses. At the time of his apprehension, he was perspiring heavily and breathing hard. He was taken to Security Police headquarters at Scott and TSgt A was notified to come view a suspect. He was told a person matching the description he had given had been apprehended.

Approximately 15–20 minutes after he gave up the chase, A viewed the accused in a room at Security Police headquarters. The accused was the only black male in the room and the only person not in the uniform of Security Police. A observed the accused for about a minute, viewing only

---

ing" rather than "peripheral," its admission might have violated the confrontation clause. This was a pre-Rules case. *See also United States v. Yates,* 524 F.2d 1282, 1286 (D.C.Cir. 1975). Whether the *Dutton* standard is applicable to the residual hearsay exception is open to question. *See United States v. Medico,* 557 F.2d 309, 316 n. 6 (2nd Cir.1977), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977); *United States v. West, supra* note 10, at 1138.

**21.** A "showup" is an event in which only the suspect is presented to the witness, who is asked whether or not this was the culprit. In a "lineup," the suspect is placed in a group of persons and the witness viewing the group is asked to pick out the guilty party. *See* Gilligan, *Eyewitness Identification,* 58 Mil.L.Rev. 183, 185 n. 19 (Fall 1972).

**22.** These details are taken substantially from the military judge's findings of fact.

the side portion of the accused's face; A made a positive identification of the accused.

On 2 November 1982, TSgt A viewed a lineup at Security Police Headquarters at Scott. It was held as a portion of the Article 32, 10 U.S.C. § 832 investigation of the charges in this case and consisted of the accused and four other black males of similar age and build, all dressed in civilian clothes. Neither the accused nor any other members of the line-up wore glasses during the line-up. The accused's defense counsel was present. At that time, TSgt A made a positive identification of the accused, noting the absence of the glasses.

The military judge made three essential findings: (a) the 30 March showup was unnecessarily suggestive within the meaning of Mil.R.Evid. 321(b)(1) and would be suppressed;[23] (b) the 2 November 1982 lineup was lawful and not unnecessarily suggestive; and (c) the 2 November identification had a basis independent from the improper showup identification procedure on 30 March—the independent basis was the degree and accuracy of TSgt A's pre-showup description.

We turn now to a detailed consideration of whether the later eyewitness identification was reliable even though the showup procedure was suggestive.

In military law, eyewitness identification is governed by Rule 321, Mil.R.Evid. For purposes of the instant case, that rule provides: (a) relevant out-of-court eyewitness identification is admissible within certain parameters; (b) such evidence will be excluded if obtained through an "unlawful identification process;" (c) such process is unlawful if "unnecessarily suggestive;" and

(d) the burden of proof as to unnecessarily suggestive identification is this:

(2) *Unnecessarily suggestive identification.* When an objection raises the issues of an unnecessarily suggestive identification process or other violation of due process under this rule, the prosecution must prove by a *preponderance of the evidence* that the lineup or other identification process *was not so unnecessarily suggestive,* in light of the totality of the circumstances, as to create a very substantial likelihood of irreparable mistaken identity; provided, however, that if the military judge determines that the identification process, although unnecessarily suggestive, did not create a very substantial likelihood of irreparable mistaken identity, a *later identification may be admitted into evidence if the government proves by clear and convincing evidence that the subsequent identification is not the result of the improper identification.* (emphasis added).

This rule implements the landmark trilogy of *Wade-Gilbert-Stovall.*[24] Prior to that time, eyewitness identification "had been a neglected area of criminal law."[25]

Philosophically, the problems of sanitizing the testimony of a witness who had made an earlier identification are these: First, he tends to maintain his original pick by a process of autosuggestion, continually seeking to justify his earlier opinion; second, as a matter of common experience, he is not likely to go back on his word; third, the police may either intentionally or unwittingly suggest that the suspect is indeed the culprit.[26]

In this vein, the Supreme Court further refined its approach to this matter in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34

---

**23.** The prosecution conceded that the 30 March showup was unnecessarily suggestive.

**24.** *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *See also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

**25.** Gilligan, *supra* note 21, at 183.

**26.** Gilligan, *supra* note 21, at 184–185. The rule "is not without its flaws, and soft spots in draftsmanship have created areas which will undoubtedly be the subject of future judicial consideration." Gasperini, *Eyewitness Identification Under the Military Rules of Evidence,* Army Lawyer 42, 45 (May 1980).

L.Ed.2d 401 (1972). The *Wade-Gilbert-Stovall* and *Neil v. Biggers* cases recommend that five factors be analyzed in resolving whether a *subsequent* identification is admissible following an earlier identification which is unnecessarily suggestive:

1. Did the witness have an opportunity to view the criminal at the time of the crime?
2. What was the witness' degree of attention?
3. What was the accuracy of the witness' prior description of the alleged criminal?
4. What was the level of certainty demonstrated by the witness at that confrontation?
5. What was the length of time between the crime and the confrontation?

■ In the present case, the military judge considered the five *Biggers* factors [27] and ruled that the 2 November 1982 identification was permissible. After careful perusal of the record, we agree. *United States v. Fors,* 10 M.J. 367, 372–373 (C.M.A. 1981); *United States v. Quick,* 3 M.J. 70 (C.M.A.1977); *United States v. Reynolds,* 15 M.J. 1021 (A.F.C.M.R.1983). *See also United States v. Gholston,* 15 M.J. 582 (A.C.M.R. 1983); *United States v. Batzel,* 15 M.J. 640 (N.M.C.M.R.1982). As for whether the witness had sufficient time to see the accused, (Factor 1) we find particularly discerning *United States v. Quick, supra,* and the cases cited therein at 74–75. Concerning quick detective work, (Factor 5), *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Smith,* 2 M.J. 562 (A.C.M.R.1976); *Jackson v. Fogg,* 589 F.2d 108, 111 (2nd Cir.1978); and *Harris v. Dees,* 421 F.2d 1079, 1082 (5th Cir.1970) are per-

suasive. Finally, in regard to the overall matter of whether the identification had an independent source, *United States v. Cyrus,* 41 C.M.R. 959, 961 (A.F.C.M.R.1970) and *United States v. Clifton,* 48 C.M.R. 852 (A.C.M.R.1974) illustrate a reasoned application to the area. *See generally* Annot., 39 A.L.R.3d 487, 507 and 791 (1971).

We have considered the tenor of such Court of Military Appeals cases as *Fors* and *Quick,* as well as the decisions of our fellow military courts. After reviewing the Supreme Court's guidance in this area and analyzing the totality of the circumstances in this case, we find that the record of trial unequivocally supports in a positive way the factors of the *Biggers* test. Accordingly, we hold that the military judge ruled correctly in finding the lineup identification reliable and not the product of an earlier unduly suggestive pretrial showup. *United States v. Fors, supra,* at 372–373. *See also* Saltzburg, Schinasi and Schlueter, Military Rules of Evidence Manual 176–177 (1981).

**IV**

■ The accused avers that two violations of the Jencks Act prejudiced him. We disagree.

As for the inadvertently-destroyed working notes of the agent who first interviewed Mrs. Peola White, we find *United States v. Durden,* 14 M.J. 507, 509 (A.F.C.M.R.1982) and the cases cited therein dispositive. *See also United States v. Myers,* 13 M.J. 951, 952 (A.F.C.M.R.1982) and *United States v. Boyd,* 14 M.J. 703, 706 (N.M.C.M.R.1982).

Similarly, the memory tickler notes of Sergeant Parker are governed by the ra-

---

**27.** The military judge found as follows:

   a. Although the time TSgt A viewed the perpetrator at the time of the crime was brief, the nature of the encounter and his observations were sufficient to leave a definite image of the perpetrator in his mind.

   b. The exchange of greetings and the similarity of the bag carried by the perpetrator to his own attracted TSgt A's attention to the man. TSgt A's degree of attention during the encounter was high as evidenced by the detailed description he gave.

   c. TSgt A's description of the perpetrator given to Security Police prior to the show-up was an accurate description of the accused at the time of his apprehension.

   d. TSgt A's level of certainty as to identifying the accused at the 30 March show-up was high.

   e. The time between the crime and the 30 March 82 show-up, approximately 15–20 minutes, was brief.

tionale of *Durden*. See also *United States v. Boyd, supra.*

## VII

The accused raises two matters concerning multiplicity.

 He first asserts that the two larcenies of gym bags and their contents at Scott Air Force Base, Illinois were multiplicious for findings. (The offenses were ruled multiplicious for sentencing purposes). As for findings, we do not find *United States v. Wenz*, 1 M.J. 1030 (N.C.M.R.1976), *pet. denied*, 2 M.J. 228, cited by the defense, dispositive: that case relates only to sentence multiplicity. On the facts here—larcenies from two victims—we do not find the offenses multiplicious for *findings*. See generally *United States v. Holt*, 16 M.J. 393 (C.M.A.1983).

The second matter is the defense contention that submitting a false claim is multiplicious for sentencing with using a forged document in support of that false claim. Our disposition of the residual hearsay matter in Section III moots this problem. We do not at this time consider these matters as multiplicious. *See generally United States v. Rigsby*, 6 M.J. 550 (A.F.C.M.R. 1978); *United States v. Hudson*, 2 M.J. 958 (A.C.M.R.1976); *United States v. Kirkle*, 50 C.M.R. 552 (A.F.C.M.R.1975); *contra United States v. Tucker*, 29 C.M.R. 790 (A.F.B.R. 1960) and *United States v. Cashwell*, 45 C.M.R. 748 (A.C.M.R.1972). *See generally United States v. Kotulski*, 16 M.J. 43 (C.M.A.1983) and *United States v. Copeland*, 14 M.J. 835 (A.F.C.M.R.1982).

## VIII

The other error raised is resolved adversely to the accused.

## IX

The findings of guilty of the Specifications of Charge I and Specification 3 of Charge II are affirmed. Because of the residual hearsay matter the decision of the court below as to Specifications 1 and 2 of Charge II is reversed. The findings of guilty of those offenses and the sentence are set aside. A rehearing on Specifications 1 and 2 of Charge II may be ordered. If a rehearing on specifications 1 and 2 of Charge II is deemed impracticable, those Specifications and that Charge may be dismissed and a rehearing on sentence may be held based on the remaining affirmed findings of guilty.

CANELLOS and RAICHLE, Judges, concur.